UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-322 (SRN)

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| | ) **GOVERNMENT'S POSITION** |
| v. | ) **REGARDING SENTENCING** |
| | ) |
| MATTHEW THOMAS ONOFRIO, | ) |
| | ) |
| Defendant. | ) |

The United States of America, by and through its attorneys, Daniel N. Rosen, United States Attorney for the District of Minnesota, and Matthew C. Murphy, Assistant United States Attorney, submits the following sentencing memorandum and respectfully requests that the Court impose a sentence of 72 months' imprisonment.

## THE OFFENSE CONDUCT

In 2019, Matthew Onofrio—a young nurse anesthetist and real estate investor—created a real estate investment program guaranteed to make him rich. The program was straightforward. First, Onofrio identified what he characterized as undervalued commercial properties and negotiated and signed purchase agreements allowing him to purchase the property at a later date for a determined price (the "Contract Price"). Onofrio then assigned the purchase agreements to his investors for a higher price (the "Resale Price"),

earning himself a substantial profit (the "Assignment Fee"). Finally, Onofrio would help his investors create limited liability companies, inspect the properties, negotiate leases and property management agreements, obtain appraisals, and apply for loans. The keys to Mr. Onofrio's success were: (1) quickly finding novice investors to whom he could flip the properties; and (2) getting the investors to pay highly inflated Resale Prices.

To achieve the former, Onofrio promoted his own financial success and real estate investment strategies in online professional networking groups and on a popular podcast geared towards aspiring real estate investors, called "Bigger Pockets." He leveraged those platforms to create a reputation as something of a real estate savant, which attracted investors.

To achieve the latter, Mr. Onofrio kept his purchase agreements and Contract Prices secret from his investors. Onofrio instead showed his would-be-investors the properties' projected income generation—based on rents, depreciation schedules, and other tax advantages—to convince them the investment was financially viable even at his inflated Resale Price. As a result, some of Onofrio's investors did not understand they were buying a purchase agreement from Onofrio as opposed to buying the property directly from the owner. And to the extent Onofrio's investors understood the mechanics of the deal, they typically had no idea what Onofrio's assignment fee was. It was only after closing, when Mr. Onofrio simultaneously assigned the purchase

agreement to his investors for the Resale Price and purchased the property from the seller for the Contract Price, that most investors learned just how much Onofrio made on the deal.

Onofrio also kept his purchase agreements and Contract Prices secret from the appraisers during the loan application process, and from the banks themselves. If the appraisers knew about the purchase agreements and Contract Prices, their valuations would have more closely reflected the Contract Prices because they were the product of contemporaneous arms-length negotiations between the sellers and Onofrio, and therefore good indicators of the properties' fair market value. Instead, the appraisers relied upon the much higher Resale Prices as indicators of the properties' fair market value, falsely believing the Resale Prices resulted from arms-length negotiations between Onofrio's investors and the property sellers. The banks, in turn, relied on the faulty appraisals when deciding whether to make loans.

The problem with Mr. Onofrio's investment program was that many of the aspiring real estate investors it attracted did not have the kind of money necessary to purchase the multi-million-dollar properties Onofrio offered. Banks typically will only approve a commercial real estate loan if the buyer has about 30% of the purchase price in cash, and very few of Onofrio's investors had that kind of money. Mr. Onofrio therefore conspired with his investors to defraud banks by misrepresenting their creditworthiness in loan applications.

The fraud took several forms. Mr. Onofrio helped investors prepare fraudulent personal financial statements falsely indicating they had enough cash to cover the requisite down payment. (*See* PSR ¶ 14.) When the lending banks inevitably requested proof of funds, Mr. Onofrio temporarily wired the money into his investors' bank accounts, making it appear they actually had the money. (*See id.*) If the banks asked about the source of the funds, Onofrio instructed his investors to tell the banks they had family money. (*See id.*) Mr. Onofrio would also loan his investors money to cover the down payment but would not include the loans on the investors' personal financial statements or record the promissory notes as a second mortgage on the property to keep it hidden from the banks. (*See* PSR ¶ 15.) Onofrio could do this with little risk because the loan proceeds always exceeded the Contract Price, and the down payment was roughly equivalent to his assignment fee. So, Onofrio was effectively deferring part of his assignment fee by lending his investors' money for the down payment. And even though these loans were unsecured, if the investors eventually defaulted it simply meant Onofrio received a smaller assignment fee than originally expected. In other words, Onofrio could not lose. The only variable was how much he could win.

Over the course of approximately two years, Onofrio completed 68 deals involving $420,564,795 in fraudulently obtained bank loans. (*See* PSR ¶ 25.) For those 68 deals, the cumulative Contract Price was $408,169,335, while the

cumulative Resale Price was $533,592,525. (*See id.*) That meant Onofrio stood to earn a minimum of about $12 million and a maximum of roughly $125 million plus interest, depending on his investors' default rate. (*See id.*) Although many of Onofrio's investors stopped paying on their promissory notes following Onofrio's indictment in this case, Onofrio netted at least $35,745,252 from his fraudulent scheme before being caught. (*See* PSR ¶ 5.)

## **SENTENCING RECOMMENDATION**

In *Gall v. United States*, the Supreme Court set forth the appropriate sentencing methodology. 552 U.S. 38, 49–50 (2007). The district court should first calculate the advisory Sentencing Guidelines range. *Id.* at 49. After calculating a defendant's advisory Sentencing Guidelines range and hearing from the parties, the district court must then consider the sentencing factors set forth in 18 U.S.C. § 3553(a) and make an individualized assessment based on the facts in arriving at an appropriate sentence. *Id.* at 49–50; *see also United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors.").

### A.    Sentencing Guidelines Range

The government has no objections to the Guidelines calculation contained in the presentence report. Accordingly, the government agrees that the base offense level is 7, pursuant to 2B1.1(a)(1). The government agrees that the offense level should be increased by 18 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(J) because the loss amount is more than $3,500,000 but less than $9,500,000, by 2 levels pursuant to U.S.S.G. § 2B1.1(b)(17)(A) because the defendant derived more than $1,000,000 in gross receipts from a financial institution, and by 4 levels pursuant to U.S.S.G.§ 3B1.1(a) because the defendant was the leader or organizer of an extensive criminal scheme that involved 5 or more participants. The government further agrees that the offense level should be reduced by 3-levels for acceptance of responsibility, pursuant to U.S.S.G. § § 3E1.1(a)-(b). Finally, the government agrees that the defendant falls into criminal history category I.

With a total offense level of 28 and a criminal history category I, the sentencing Guidelines range is 78-97 months' imprisonment.

### B.    Section 3553(a) Sentencing Factors

Section 3553(a) requires the Court to analyze several factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further

6

crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a).

### 1. Nature and Circumstances of the Offense

Mr. Onofrio committed a serious crime that merits a serious sentence. To facilitate real estate transactions that made him substantial profits, Mr. Onofrio conspired with his investors to fraudulently procure over $420 million in loan proceeds from 20 different federally insured financial institutions. By helping his investors misrepresent their creditworthiness, including their ability to pay the requisite down payments with their own money, Onofrio ensured they had the funds necessary to complete the deals. Moreover, by secretly lending millions of dollars to his investors to cover the down payments, Mr. Onofrio effectively decreased the profitability of the properties (or increased the loan to value ratio), undermining the formula the banks used to assess the sufficiency of the collateral. By structuring the deals as he did—with his investors investing none of their own money and Mr. Onofrio secretly loaning his assignment fee to his investors to cover the down payment—Mr. Onofrio effectively shifted all the risks to the banks, while ensuring any benefits would go to him and his investors.

Mr. Onofrio knew what he was doing was illegal but did it anyway because he wanted to get rich. To his credit, Mr. Onofrio immediately accepted

responsibility for his actions and worked diligently to mitigate the harm his actions caused.

### 2. History and Characteristics of the Defendant

Mr. Onofrio has no prior arrests or criminal convictions and no history of substance abuse. He is a longtime Minnesota resident with substantial ties to the community. He has maintained gainful employment his entire adult life.

### 3. Deterrence, Respect for the Law, and Protecting the Public

The Court must also consider the need for the sentence to afford adequate deterrence, promote respect for the law, provide just punishment, and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a). Mr. Onofrio's offense conduct, while extensive, occurred over a short period and appears to be an aberration in his otherwise law-abiding life. His immediate and complete acceptance of responsibility demonstrates a respect for the law, and his contrition also tends to show that he is unlikely to recidivate. Just punishment is an important sentencing factor but is mitigated to some degree by the financial, professional, and reputational consequences Mr. Onofrio has already incurred because of his conviction.

### 4. The Need to Avoid Unwanted Disparities

Finally, the Court must consider the need to avoid unwarranted disparities. 18 U.S.C. § 3553(a). As noted in the PSR, defendants convicted

within the past four years of the same offense, with the same offense level and criminal history as Mr. Onofrio, receive an average sentence of 61 months.

## CONCLUSION

For the reasons stated above, the government respectfully recommends that the Court sentence Mr. Onofrio to 72 months' imprisonment. Such a sentence is sufficient but not greater than necessary to meet the Section 3553(a) factors.

Respectfully Submitted,

Dated: November 24, 2025,   DANIEL N. ROSEN
United States Attorney

/s/ *Matthew C. Murphy*
BY:   MATTHEW C. MURPHY
Assistant U.S. Attorney